**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Alejandro PEREZ, Defendant–Appellee.**

**No. 08SA130.**

Supreme Court of Colorado, En Banc.

Feb. 23, 2009.

Carol Chambers, District Attorney, Eighteenth Judicial District, Paul R. Wolff, Chief Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Killmer, Lane & Newman LLP, David A. Lane, James A. Castle, Judy L. Lucero, Denver, Colorado, Attorneys for Defendant–Appellee.

Ted C. Tow, III, Executive Director, Denver, Colorado, Attorney for Amicus Curiae Colorado District Attorney's Council.

John W. Suthers, Attorney General, Paul Koehler, First Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae Colorado Attorney General.

Sandy Mullins, Executive Director, M. Ann England, Denver, Colorado, Attorneys for Amicus Curiae Colorado Criminal Defense Bar.

Justice EID delivered the Opinion of the Court.

In this interlocutory appeal, we review the trial court's order disqualifying the Office of the District Attorney for the Eighteenth Judicial District from prosecuting defendant Alejandro Perez. The District Attorney sought the death penalty against Perez, an inmate at the Limon Correctional Facility, stemming from his alleged involvement in the murder of another inmate, Jeffrey Heird. The trial court disqualified the entire District Attorney's Office from prosecuting the case based on its conclusion that "special circumstances ... would render it unlikely that the defendant would receive a fair trial" under section 20–1–107(2), C.R.S. (2008).

The trial court cited four grounds to support its disqualification of the entire Office. First, it found that disqualification was required because an individual prosecutor in the case, Dan Edwards, had previously represented Perez as a private defense attorney on a Crim. P. 35(c) motion challenging a second-degree murder conviction—the same second-degree murder conviction that the prosecution used as a death penalty aggravator in the instant case. Second, the trial court found that disqualification of the entire Office was further warranted due to the involvement of another individual prosecutor, Robert Watson, who aided in the initial investigation of the Heird murder. Watson, when he was a private defense attorney, had previously represented Michael Snyder, an inmate witness and possible alternate suspect in the Heird murder. Third, the trial court

found that the prosecution's witness list, which contained the names of several inmate witnesses, was inaccurate and insufficiently detailed. Finally, the court concluded that the funding arrangement between the District Attorney's Office and the Department of Corrections, under which the Office directly billed the department for costs associated with prosecuting Perez, violated section 16–18–101(3), C.R.S. (2008). That section permits counties to seek reimbursement of costs associated with the prosecution of crimes occurring in correctional facilities.

We hold that there are no "special circumstances" that would "render it unlikely that the defendant [Perez] would receive a fair trial" under section 20–1–107(2), and therefore reverse the trial court's order disqualifying the entire District Attorney's Office. The inquiry into whether an entire district attorney's office should be disqualified, due to a prior representation by an individual prosecutor, depends on whether confidential information gained from that prior representation has been or could be passed from the individual prosecutor to other members of the office who continue to prosecute the case. Here, there was no showing that either Edwards or Watson ever possessed confidential information from their prior representations. Therefore, no confidential information was passed, or could have been passed, to other members of the Office. We also hold that the allegedly inadequate witness list and the funding arrangement do not constitute "special circumstances" that would prevent a fair trial. Accordingly, we reverse the trial court's disqualification of the entire Eighteenth Judicial District Attorney's Office and

remand for further proceedings consistent with this opinion.

## I.

On March 28, 2004, Jeffrey Heird, an inmate at the Limon Correctional Facility, was found stabbed to death in his cell. The Department of Corrections ("DOC") and Robert Watson, then Deputy District Attorney for the Eighteenth Judicial District Attorney's Office ("DA's Office"), began an investigation. In December 2005, after further investigation, Carol Chambers, the District Attorney for the Eighteenth Judicial District, filed first-degree murder charges against Alejandro Perez and David Bueno, both Limon Correctional Facility inmates at the time of the murder.[1]

Chambers announced her intent to seek the death penalty against Perez and Bueno in October 2006. When a prosecutor in Colorado announces intent to seek the death penalty, the prosecutor has twenty days to provide the defendant with, among other things, a list of aggravating factors and a list of witnesses whom the prosecutor may call, specifying for each the witness' name, address,[2] and date of birth, and the subject matter of the witness' testimony. § 18–1.3–1201(3)(b), C.R.S. (2008); Crim. P. 32.1(d)(2). Pursuant to these provisions, the People filed a Notice of Aggravators, Witnesses, and Evidence, P–9 ("P–9"), listing witnesses who may testify to the subject matter described.[3] The prosecution also listed statutory aggravating factors in support of its intent to seek the death penalty. Specifically, aggravator number one stated, "[t]he class one felony [the Heird murder] was committed by a person under sentence

---

1. Chambers also filed first-degree murder and conspiracy charges against Michael Ramirez, another Limon Correctional Facility inmate, for his alleged involvement in the Heird murder.

2. Prior to the filing of this interlocutory appeal, the People filed, and we granted, a C.A.R. 21 petition seeking to prevent the trial court from requiring disclosure of the addresses of law enforcement witnesses in this case. We stayed the proceeding pending review of the disqualification appeal.

3. During proceedings below, the prosecutors who worked on the P–9 witness list testified that they listed many witnesses they believed were

"eye and ear" witnesses—that is, individuals who, because of their presence in the prison at the time of the murder, would likely have knowledge about the crime. Perez called some of these inmate witnesses to testify. Many denied that they ever made the statements set forth in the endorsement and some denied ever talking to an investigator or that they were present to be eye and ear witnesses. Leslie Hansen, the Assistant District Attorney who signed off on the P–9, testified that there may have been some mistakes in the witness list, such as including witnesses who were not in the correctional facility at the time of the crime.

of imprisonment for a class 1, 2, or 3 felony as defined by Colorado law." At the time of Heird's murder, Perez was serving a sentence for a 1997 second-degree murder conviction, a class two felony.

Because the prosecutors sought the death penalty, the attorneys in the Capital Crimes Unit of the Attorney General's Office became available as a resource to them. In Colorado, attorneys in the Capital Crimes Unit assist counties throughout the state with death penalty cases. The Attorney General's Office describes the responsibilities of these attorneys as "[p]rovid[ing] special assistance to district attorneys in death penalty ... cases." The two members of the Capital Crimes Unit, Dan Edwards and Sue Trout, were assigned to the DA's Office as "Special Deputy District Attorneys" to aid in the death penalty prosecutions of Perez and Bueno. They became part of the DA's Office for the purpose of prosecuting Perez and Bueno and acted under the direction of the DA's Office.

Six days after Edwards made his first appearance in the Perez case, Perez filed a Motion to Dismiss or in the Alternative, for Disqualification of the District Attorney and Appointment of a Special Prosecutor, P–46 ("P–46"). He sought the disqualification of the entire DA's Office and the Office of the Attorney General,[4] arguing, in part, that the People had a conflict of interest in prosecuting the case because Edwards previously represented Perez.

On the same day, Perez also filed his Motion for Immediate Protective Order, P–47 ("P–47"). Although the trial court ultimately held multiple hearings on the P–46 motion, it granted the P–47 motion the same day it was filed, without a hearing or response from the People. Entering Perez Order No. 25 in response to P–47, the court stated:

> Daniel Edwards is preclud[ed] from appearing in any capacity in [Perez's] case. Mr. Edwards is precluded from speaking with the district attorneys, members of the Attorney General's Office, or any other person regarding this case, Alejandro Perez. . . . Mr. Edwards is further precluded from reviewing material connected with this case, and from filing any pleading.

The alleged conflict asserted in P–46 and P–47 arose out of Edwards' prior representation of Perez. On August 27, 2002, the Denver District Court appointed Edwards, then a defense attorney in private practice, as counsel to represent Perez on a Crim. P. 35(c) motion. This motion challenged Perez's 1997 second-degree murder conviction— the same second-degree murder conviction that the prosecution used as a death penalty aggravator in the present case. After his appointment, in order to prepare to serve as Perez's defense counsel on the Crim. P. 35(c) motion, Edwards filed a request to withdraw the trial transcripts. Edwards' next filing in the case was a motion to withdraw as counsel because of severe eyesight problems. Edwards never filed any pleading on Perez's Crim. P. 35(c) motion, and the court granted his motion to withdraw.

During hearings challenging Order No. 25, Edwards testified that when he was assigned to work on the present prosecution of Perez, he did not recall previously representing Perez on the Crim. P. 35(c) motion and thus did not disclose the prior representation either to the court or to the defense.[5] Edwards stated that while his typical practice, upon assignment as counsel, is to send a letter to the defendant introducing himself and explaining the process, he did not specifically recall

---

4. The title of the P–46 only requested disqualification of the District Attorney. However, in the body of the motion, Perez argued for disqualification of the entire Eighteenth Judicial District Attorney's Office and the Office of the Attorney General. Subsequently, on January 11, 2008, Perez filed a supplement to P–46 where he amended his disqualification request. He no longer requested the disqualification of the entire Office of the Attorney General but only the Capital Crimes Unit. Consequently, the trial court ultimately ruled on a request to disqualify the entire DA's Office and a request to disqualify the Capital Crimes Unit.

5. Edwards testified that the Attorney General's Office, which hired him to join the Capital Crimes Unit in May of 2007, did have a screening policy in place, but that the Capital Crimes Unit did not. The DA's Office also did not have a screening policy in place; instead, according to Chambers, she relied upon the attorneys to follow the law and their ethical obligations.

communicating with Perez. He further testified that he did not receive any information, confidential or otherwise, from Perez.[6] Edwards said that there was no information to pass along to any of the members of the Attorney General's Office or the DA's Office, and that no information had in fact been passed.

The trial court ultimately reaffirmed Order No. 25—the order prohibiting Edwards from working on the instant Perez litigation—and further ordered Edwards not to search for his file, time records, or any material involving his previous representation of Perez. After the court reaffirmed the protective order, Chief Deputy District Attorney Dan May, the lead prosecutor for the Perez and Bueno cases, sought to clarify whether Edwards could work on the Bueno case without violating Order No. 25. The trial court replied, "[t]he deeper Mr. Edwards gets into this case, the more it muddles the Bueno case and that's the problem here. That's just my own thinking. And I guess that's a risk that you take; he takes; everybody takes." The judge later clarified this comment to May, stating that he was alerting the People that they proceeded at their own risk, in the Perez case, if Edwards worked on the Bueno case.

After Order No. 25, Edwards ceased all work on the pending Perez case but continued to work on the Bueno case, performing general legal research and analysis concerning both aggravating factors in death penalty cases and jury selection. He also prepared drafts of pleadings in the Bueno case.

Although Order No. 25 immediately screened Edwards from the Perez litigation, the trial court still had to consider P–46. In

P–46, in addition to arguing that the Edwards' conflict should be imputed to disqualify the entire DA's Office and the Capital Crimes Unit, Perez also argued that the People's P–9 witness list violated Crim. P. 32.1(d)(2) and C.R.C.P. 11, because it was inadequate. Specifically, he claimed that in filing the P–9, the "prosecutor knowingly filed a document purporting to give the 'subject matter of the witnesses' testimony' [as required by section 18–1.3–1201(3)(b) and Crim. P. 32.1(d)(2)], which the prosecutor knew to be false." Perez stated that "the prosecution had no good faith basis whatsoever, and continue[s] to have no good faith basis, for believing that any given inmate ... will testify as to any of the facts contained in the above-referenced endorsement." Perez argued that these inadequacies were further grounds for disqualification of the DA's Office.

The trial court, beginning in June 2007, held numerous hearings on the P–46. Throughout the hearings, Perez filed a series of supplemental motions to P–46. In one of these motions, he argued that because Edwards continued to work on the Bueno case, "the entire Office of the District Attorney is implicated in the conflict of interest and must be disqualified, as well as the Capital Crimes Unit." He also contended that the funding arrangement[7] for the prosecution of the Perez and Bueno cases, whereby the DA's Office directly billed the DOC with the understanding that the money would then be forwarded to the counties, violated section 16–18–101(3), C.R.S. (2008) and presented a further conflict of interest warranting disqualification.[8] More specifically, Perez alleged that the financial arrangement prevented the DA's Office from remaining

---

**6.** Perez's DOC visitation log indicated that Edwards never visited him, though Edwards was in Perez's phone list.

**7.** According to the People, the funding arrangement arose out of custom and tradition.

**8.** This section governs reimbursement of the county by the DOC for the cost of prosecuting a crime committed by a person in DOC custody. Section 16–18–101(3), C.R.S. (2008) provides:

The department of corrections, from annual appropriations made by the general assembly,

shall reimburse the county or counties in a judicial district for the costs of prosecuting any crime alleged to have been committed by a person in the custody of the department ... and upon approval of the executive director of the department, the costs shall be paid. The provisions of this subsection (3) shall apply to costs that are not otherwise paid by the state.

Under the funding arrangement, instead of informing the counties of the cost of the prosecution and having them bill the DOC, the DA's Office billed the DOC directly and then would reimburse the counties. The counties never objected to this arrangement.

independent and disinterested, and that because of the arrangement, the DA had a personal financial interest in the case.

Perez's final supplement to P–46 advised the court that Watson, who aided in the initial investigation of the Heird murder, had previously represented Michael Snyder, a Limon Correctional Facilities inmate at the time of the murder and a possible alternate suspect.[9] Perez argued that this conflict also supported disqualification of the entire DA's Office and the Capital Crimes Unit.

Watson testified that he worked on the Heird murder for five months, and that he was not involved with the case after leaving the DA's Office in August 2004, which was before Perez (or Bueno) was charged.[10] Watson also testified that, while investigating the murder, he did not recall his previous representation of Snyder.

In sum, when ruling on P–46, the district court considered four arguments Perez had presented as grounds for the disqualification of the DA's Office, Edwards as an individual,[11] and the Capital Crimes Unit: (1) the alleged conflict presented by Edwards' prior representation of Perez; (2) the alleged conflict presented by Watson's prior representation of Snyder; (3) the P–9 witness list; and (4) the alleged conflict created by the funding arrangement. In reliance on its "inherent powers" and on section 20–1–107(2), C.R.S. (2008), which permits disqualification upon a showing that "special circumstances ... would render it unlikely that the defendant would receive a fair trial," the trial court issued Order No. 60, disqualifying Edwards as well as "[t]he entire office of the district attorney for the Eighteenth Judicial District and the capital crimes unit of the attorney general's office."

As to Edwards, the court found that his prior representation of Perez was substantially related to the present case, because the People had designated Perez's prior second-degree murder conviction as a statutory aggravator. The court further concluded that while Edwards did not violate Order No. 25, which required him to discontinue work on the instant Perez case, his work on the Bueno case was problematic.[12] The court stated:

[Edwards'] efforts in drafting pleadings in Bueno; his efforts in researching aggravators in death penalty cases; and his efforts in researching jury selection and jury instructions, indicate that neither Perez Order No. 25 nor the attorney general's screening policy were enough to protect against Mr. Edwards' involvement in the Perez case. In the back room, Mr. Edwards was providing the fodder that could be used indiscriminately by the district attorney's office and the capital crimes unit in prosecuting death penalty cases, including Mr. Edwards' own client, Mr. Perez. Mr. Edwards' efforts against Mr. Bueno, an individual charged with conspiracy allegedly conducted with Mr. Perez, were efforts applied against Mr. Perez. Mr. Edwards has literally switched sides.

Regarding Watson, the court called Watson's prior representation of Snyder "problem[atic]," referring to Chambers' testimony that had she known of Watson's prior representation of Snyder, "it would have been 'unseemly' for him to lead the investigation." Additionally, in its factual findings, the court observed that there was "information obtained very close to the date of the murder that would or could lead one to believe that Snyder may have committed the Heird murder," and that "[o]f significance and for rea-

9. Perez argued that, during the early stages of the investigation, the prosecution considered Snyder to be a suspect based on intercepted telephone calls in which Snyder told a family member that he had been asked to kill Heird. Snyder was eventually eliminated as a suspect and was ultimately endorsed as a prosecution witness.

10. Watson's work on the case included an examination of the cell where the murder occurred, review of discovery, and a Power Point presentation on the prosecution's theory of the case.

11. The trial court did not consider whether Watson as an individual should be disqualified due to the fact that he left the DA's Office prior to the filing of charges against Perez.

12. The court stated that numerous Colorado Rules of Professional Conduct were violated but failed to elaborate which ones were violated and how they were violated.

sons unknown, Snyder was not investigated, his cell was never tossed and he was never considered to be a suspect in the case." However, the court recognized that "standing alone, [Watson's prior representation of Snyder] might not require disqualification of the entire office."

Regarding the P–9 witness list, the trial court struck "witnesses listed in [the] People's P–9 numbered 72 through 147" as prosecution witnesses against Perez. The court acknowledged that the People were dealing "with a unique kind of witness"—inmate witnesses—whose level of cooperation is unpredictable. Ultimately, however, the court found that the People violated section 18–1.3–1201(3)(b), and C.R.C.P. 11, because the P–9 endorsements contained inaccuracies and should have been more detailed.

Finally, addressing the funding arrangement, the court held that section 16–18–101(3) was violated because "the counties have been completely bypassed . . . [and] it remains that the statutory violations [of section 16–18–101(3) ] cannot be ignored in view of the fact that compliance could have been easily accomplished." The court, however, remained "unwilling to conclude that the district attorney was obtaining any intentional financial gain," or that there was any evidence of double billing.

The People sought review in this court pursuant to sections 20–1–107(3) and 16–12–102(2), which create a right of interlocutory appeal for prosecutors to contest disqualification orders. We review for abuse of discretion, *see, e.g., People v. Lincoln,* 161 P.3d 1274, 1276 (Colo.2007), and now reverse.

## II.

The trial court relied upon section 20–1–107(2), C.R.S. (2008) to disqualify the entire DA's Office, Dan Edwards as an individual, and the Capital Crimes Unit. As a preliminary matter, we consider which disqualifications are appropriately pursued in this appeal. We must examine three interrelated questions: first, which parties under section 20–1–107(2) are properly subject to disqualification; second, which parties may properly appeal their disqualification pursuant to sec-

tions 20–1–107(3) and 16–12–102(2), C.R.S. (2008); and third, which parties did in fact appeal in this case.

Section 20–1–107(2) states, "a *district attorney* may . . . be disqualified." (emphasis added). Therefore, the trial court's authority to disqualify is limited to district attorneys or district attorney's offices prosecuting the case. Under this statutory language, the DA's Office was subject to disqualification because it was the office prosecuting the instant case. Regarding Edwards, he was designated a "Special Deputy District Attorney" (along with Sue Trout) within the DA's Office, making him a member of the office for the purpose of prosecuting Perez. As a result, he was a "district attorney" also subject to disqualification under section 20–1–107(2). In sum, we find that both the DA's Office and Edwards as an individual were proper subjects of disqualification in the trial court's order.

In addition to disqualifying Edwards and the DA's Office, however, the trial court also disqualified the Capital Crimes Unit, of which Trout and Edwards were members. The disqualification of the unit was beyond the authority granted in section 20–1–107(2) because the unit was not a district attorney or district attorney's office prosecuting the case. We therefore interpret the trial court's order disqualifying the Capital Crimes Unit as an order designed to disqualify the DA's Office in its entirety, including Special Deputy District Attorneys Trout and Edwards (though, as noted above, the trial court separately disqualified Edwards as an individual). Ultimately, the functional effect is the same, as the Capital Crimes Unit consisted only of Trout and Edwards at the time of the trial court's ruling.

As to which parties can properly appeal disqualification, section 20–1–107(3) authorizes interlocutory appeal of a disqualification order pursuant to section 16–12–102(2), which states, "the *prosecution* may file an interlocutory appeal in the supreme court . . . ." (emphasis added). Section 16–12–102(2) thus permits disqualified prosecutors—those with the authority to prosecute—to challenge their disqualification. *See, e.g.,*

*People v. Lincoln,* 161 P.3d 1274, 1276 (Colo. 2007) (appellants comprised of individual disqualified prosecutors and a disqualified district attorney's office). In this case, only the DA's Office has filed an appeal of the trial court's disqualification ruling. Of note, however, is the fact that the DA's Office did not appeal—and makes no argument regarding the disqualification of Edwards as an individual.[13] Although Edwards as a member of the DA's Office could have challenged his own disqualification through an appeal, he did not do so. Additionally, while the Attorney General challenges Edwards' disqualification in an amicus brief, the Attorney General is neither a party to this interlocutory appeal, nor a "prosecutor" (in this case) who may properly appeal under section 16–12–102(2). We therefore confine our consideration in this appeal to the propriety of the trial court's disqualification of the DA's Office under section 20–1–107(2).

### III.

Pursuant to section 20–1–107(2), C.R.S. (2008), a district attorney may only be disqualified in a particular case (1) at the request of the district attorney; (2) if the court finds that the district attorney has a personal or financial interest; or (3) if the court finds special circumstances that would render it unlikely that the defendant would receive a fair trial. This court has held that the statute enumerates the *only* circumstances under which a district attorney may be disqualified. *See People ex rel. N.R.,* 139 P.3d 671, 674–75 (Colo.2006) (current statute "eliminates 'appearance of impropriety' as a basis for disqualification"); *People v. Lincoln,* 161 P.3d 1274, 1279 (Colo.2007) (same).[14] The party moving for disqualification bears the burden of showing that facts exist that would render it unlikely the defen-

dant would receive a fair trial. *Lincoln,* 161 P.3d at 1279.

In this case, the trial court relied upon the third prong to disqualify the DA's Office, finding "special circumstances" existed that would render it unlikely Perez would receive a fair trial. In support of its disqualification ruling, the trial court set forth four grounds: (1) Edwards' prior representation of Perez; (2) Watson's prior representation of witness Snyder; (3) the inadequate P–9 witness list; and (4) the funding arrangement between the DA's Office and the DOC. We consider each in turn and address whether they warrant disqualification of the DA's Office.

### A.

In considering whether Edwards' prior representation of Perez constitutes a "special circumstance" requiring the disqualification of the entire DA's Office, we begin with our caselaw discussing the imputation of an individual prosecutor's conflicts to the entire prosecutor's office. Recently, in *People v. Chavez,* 139 P.3d 649, 655 (Colo.2006), we observed that the question is "whether *confidential information* from a prior representation . . . has been and can continue to be adequately screened from others actually prosecuting the case." (emphasis added); *see also People v. Manzanares,* 139 P.3d 655, 659 (Colo.2006) (stating that the inquiry is "whether confidential information has been and can continue to be screened from those members of the District Attorney's Office who would actually prosecute defendant's case"). The focus of the inquiry, then, is on whether confidential information has been or could be passed from the prosecutor with the conflict to other members of the district attorney's office prosecuting the case. We have noted that district attorney's offices are

---

13. In their brief the People stated, "The District Attorney is *only* contesting her own office's disqualification." (emphasis added).

14. Section 20–1–107, the disqualification statute, does not include a special or separate standard for disqualification in death penalty cases. While in certain circumstances the General Assembly has created special statutory requirements when the prosecutor seeks the death penalty, *see, e.g.,* § 18–1.3–1201(3)(b), C.R.S. (2008);

Crim. P. 32.1(d)(2) (outlining special disclosure requirements), it chose not to do so here. *See, e.g., Dunlap v. People,* 173 P.3d 1054, 1094–95 (Colo.2007) (applying disqualification statute to a death penalty case without employing a special standard). Perez argues that we should apply a standard of heightened reliability. Even if we were to apply a standard of heightened reliability, however, the result would be the same because we find no grounds for disqualification.

different from private law firms in part because prosecutors do not choose the cases that come before them; instead, they are required by the Colorado Constitution to prosecute crimes in their districts. *See Lincoln*, 161 P.3d at 1278 (noting that section 20–1–107(2) is "designed to ensure that district attorneys can perform their public duty as mandated by the Colorado Constitution"). Thus, the focus of the disqualification inquiry—that is, whether any confidential information has been passed from the individual prosecutor to other members of the office—strikes an appropriate balance between ensuring fairness to the defendant while also recognizing the public duty of district attorney's offices to prosecute cases arising in their districts.

Applying this inquiry to the case at bar, the question is whether any confidential information from Edwards' prior representation of Perez was or could have been passed to the members of the DA's Office who continue to prosecute this case. The record demonstrates that no such confidential information existed in the first place,[15] and therefore, no confidential information was or could have been passed to the members of the DA's Office prosecuting the case.

 When Edwards was assigned to the DA's Office, he did not even recall his prior representation of Perez. After learning of the alleged conflict, Edwards testified about the limited work he performed on Perez's previous case: he filed a motion to withdraw the transcripts and a motion to withdraw from the case. He further testified that he never met with Perez and does not recall any communication with him. The only information Edwards possessed regarding the prior case is the fact that Perez was convicted of second-degree murder—information that is in the public record.[16] Indeed, he stated that he never received any information from Perez, confidential or otherwise, and there is no evidence to the contrary. Although we take

Edwards' assertion as true because "the prosecuting attorney as an officer of the court must not lie or misrepresent facts to the court," *Lincoln*, 161 P.3d at 1281, we do not rely solely on his representations. Rather, we reach our conclusion based upon the facts in the record, Edwards' testimony, and the circumstances surrounding both his prior representation and his involvement in the current case. Given that Edwards did not recall his prior representation of Perez, never performed any substantive work on the case, and never received information from Perez, there is no risk that Edwards passed confidential information to other members of the DA's Office. Additionally, according to our standard outlined in *Lincoln*, the *defendant must establish facts* sufficient to support a conclusion that he will not receive a fair trial. 161 P.3d at 1279 (citing *People ex rel. N.R.*, 139 P.3d at 677; *People v. C.V.*, 64 P.3d 272, 275–76 (Colo.2003); *Wheeler v. Dist. Court*, 180 Colo. 275, 278–79, 504 P.2d 1094, 1096 (1973)). Perez has presented no facts to show that Edwards either possessed confidential information or passed it to members of the DA's Office.

Moreover, although Edwards had no confidential information that could have been passed to other prosecutors, Order No. 25 served as an additional precaution by screening Edwards from Perez's case. The order prohibited Edwards from working on the Perez case, and the trial court found that he never violated it. Thus, although the trial court pointed to the fact that the DA's Office had no screening policy in place, Order No. 25 effectively screened Edwards from the case. We therefore conclude that Edwards' previous representation of Perez did not constitute a "special circumstance" warranting disqualification of the entire DA's Office, because no confidential information was, or could have been, passed to other members of the office.

---

15. We do not entertain arguments about hypothetical confidential information; rather, we look only to the record.

16. Public information is not subject to attorney-client privilege. In an analogous case in Missouri, the court there noted that "[a]ppellant's conviction was used in the present case only to

prove that he was a prior offender. Appellant's conviction was a matter of public record, available to any prosecutor. The prosecutor need not be disqualified simply for entering the felony stealing conviction into evidence." *State v. Smith*, 32 S.W.3d 532, 542 (Mo.2000).

■ Our conclusion that "special circumstances" do not exist here is reinforced by the Colorado Rules of Professional Conduct. *See In Re J.C.T.*, 176 P.3d 726, 735 (Colo. 2007) (stating that "we seek guidance from ... the Colorado Rules of Professional Conduct"). The rules distinguish between the imputation of individual conflicts of interest to all members of private law firms and the imputation of individual conflicts to all members of government legal offices. Rule 1.10 sets forth the circumstances under which the conflict of an individual private attorney is imputed to a private law firm. By contrast, Rule 1.11 creates a "special imputation rule" for the conflicts of individual government lawyers. The comments state,

> Because of the special problems raised by imputation within a government agency, paragraph (d) [which describes the ethical responsibilities for individual government lawyers when presented with a conflict] *does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees*, although ordinarily it will be prudent to screen such lawyers.

Colo. RPC 1.11 cmt. 2 (2008) (emphasis added). Thus, Rule 1.11 does not impute an individual prosecutor's conflict to the entire office. Even assuming Edwards' prior representation of Perez created a conflict, it would not automatically be imputed to the entire DA's Office under Rule 1.11. Accordingly, it is difficult to see how his previous involvement necessarily constitutes a "special circumstance" requiring disqualification under section 20–1–107(2).

■ In considering whether to disqualify the DA's Office, the trial court focused on whether any legal work Edwards did in the Bueno case—and on death penalty prosecution in general—could have been used in the prosecution of Perez. More specifically, the court pointed to Edwards' "efforts in drafting pleadings in Bueno; his efforts in researching aggravators in death penalty cases; and his efforts in researching jury selection and jury instructions," all of which could have been used by prosecutors against Perez. The court concluded that "[i]n the back room, Mr. Edwards was providing the fodder that could be used indiscriminately by the district attorney's office and the capital crimes unit in prosecuting death penalty cases," including the case against Perez.

Any connection between Edwards' work on Bueno and the instant prosecution of Perez appears, on this record, to be tenuous at best. But even if the connection were closer, the fact that Edwards' *legal work* might have been used against Perez is not the proper inquiry. Instead, the question is whether any *confidential information* possessed by Edwards could be so used. In other words, the trial court lost sight of the focus of the imputation inquiry, which is to determine whether "confidential information from a prior representation" was or could be passed from others prosecuting the case. *Chavez*, 139 P.3d at 655; *see also Manzanares*, 139 P.3d at 659. As demonstrated above, no such confidential information existed, and therefore, it was not used against Perez.[17]

---

17. We do not consider the "substantial relationship test," because that is the test for disqualification of an individual prosecutor, not the test for disqualification of an entire office. *Compare People v. Lincoln*, 161 P.3d 1274, 1278–81 (Colo.2007) (applying the substantial relationship test to the disqualification of an individual prosecutor by holding that "no facts show that [Tuttle and Eret's] prior representation of the three witnesses is *substantially related* to the pending prosecutions against Lincoln," and concluding that as a result, no "special circumstances [the standard from section 20–1–107(2)] exist in this case that would warrant disqualification of Tuttle, Eret, and the Mesa County District Attorney's Office." (emphasis added)), *with People v. Chavez*, 139 P.3d 649, 655 (Colo.2006) (stating that the test for disqualification of an entire district attorney's office is "whether confidential information from a prior representation nevertheless has been and can continue to be adequately screened from others actually prosecuting the case"). The disqualification of an individual prosecutor is not before us. Nevertheless, in light of our prior construction of the term "substantially related" as used in Colo. RPC 1.9, *see, e.g., People v. Frisco*, 119 P.3d 1093 (Colo.2005), it seems highly questionable whether the record in this case can support a finding that Edwards' former representation of Perez was substantially related to this prosecution. It is thus difficult to see how, on this record, Edwards' prior representation could amount to a special circumstance rendering it unlikely Perez would receive a fair trial.

■ Finally, the trial court seemed concerned that the possible use of Edwards' legal work in this case might create an appearance of impropriety. It stressed the fact that the work could be used against "Mr. Edwards' own client" and that "Mr. Edwards has literally switched sides." However, our precedent establishes that the current version of the disqualification statute, by listing only three grounds for the disqualification of prosecutors, eliminates the previous "appearance of impropriety" standard. *People ex rel. N.R.*, 139 P.3d at 674–75; *Lincoln,* 161 P.3d at 1279. To the extent that the trial court based its disqualification ruling on any "appearance of impropriety" it perceived from the possible use of Edwards' legal work in this case, the court considered an improper ground for disqualification.

In sum, because confidential information from Edwards' prior representation of Perez did not reach—and could not have reached—the prosecutors working on this case, we hold that the district court erred in finding that Edwards' prior representation of Perez was a "special circumstance" warranting disqualification of the entire DA's Office.

**B.**

■ For much the same reasons, we find that the trial court's second ground—Watson's previous representation of Snyder, an inmate witness and possible alternate suspect in the Heird murder—does not constitute a "special circumstance" warranting disqualification of the entire DA's Office.

Watson was involved in the initial investigation of the Heird murder in his capacity as Deputy District Attorney for roughly five months before he permanently left the DA's Office to serve in Iraq. Watson left the

Office before Perez and Bueno were charged, and as a result, he never worked on the prosecution of Perez. Furthermore, Watson, like Edwards, did not recall his prior representation of Snyder.

The trial court did not, as a formal matter, consider whether Watson should be disqualified from prosecuting the case against Perez, because he never prosecuted Perez—Watson left the DA's office before Perez was even charged. The court did, however, refer to Watson's involvement as an investigator, given his prior representation of Snyder, as "problem[atic]." Specifically, the court referred to Chambers' testimony that had she known of Watson's prior representation of Snyder, "it would have been 'unseemly' for him to lead the investigation." The trial court's focus on the "unseemly" nature of Watson's work investigating Heird's murder sounds like it based its disqualification ruling on an "appearance of impropriety." As noted above, this court has held that section 20–1–107(2) eliminates "appearance of impropriety" as a ground for disqualification. *See People ex rel. N.R.*, 139 P.3d at 674–75; *Lincoln,* 161 P.3d at 1279.

In addition, there was no showing that Watson possessed confidential information from his prior representation of Snyder that could be passed to members of the DA's Office who continue to prosecute the case.[18] Moreover, Watson was screened from the case by the fact that he left the DA's Office before charges were filed. Even the trial court recognized that "standing alone, [Watson's prior representation of Snyder] might not require disqualification of the entire office."[19] We agree and find that Watson's prior representation of Snyder does not con-

---

18. Additionally, there is no demonstration that Watson possessed exculpatory evidence and failed to disclose it to his fellow prosecutors. Again, we do not entertain hypothetical conflicts, but rather we analyze only the facts presented in the record. *See, e.g., People v. Harlan*, 54 P.3d 871, 877 (Colo.2002) (discussing disqualification of a public defender and noting that "a trial court may not disqualify counsel on the basis of speculation or conjecture").

19. The trial court cited *Lincoln* for this proposition. In *Lincoln,* we held that, if individual

prosecutors disqualified themselves because they possessed confidential exculpatory information gained from prior representation of witnesses in the case, disqualification of the entire district attorney's office would not be necessary, if the office put in place a screening policy that would screen the disqualified attorneys from the members of the office prosecuting the case. 161 P.3d at 1282 (citing *Chavez,* 139 P.3d at 654). Here, as noted above, Watson was "screened" from others in the office since he left the office prior to the filing of charges against Perez.

stitute a "special circumstance" warranting disqualification of the entire DA's Office.

■ Finally, Perez suggested that Watson conducted an inadequate investigation of Snyder, as a possible alternate suspect in the Heird murder, because he had previously represented Snyder. The trial court, in its factual findings, observed that there was "information obtained very close to the date of the murder that would or could lead one to believe that Snyder may have committed the Heird murder," and that "[o]f significance and for reasons unknown, Snyder was not investigated, his cell was never tossed and he was never considered to be a suspect in the case." The court, however, did not refer to these matters later in its "Conclusions of Law" when it discussed Watson's prior representation of Snyder as grounds for disqualifying the entire DA's Office. It therefore appears that the court did not base its disqualification order on the rationale proposed by Perez. To the extent that it did, however, such concerns about the adequacy of the investigation and alternate suspects do not constitute "special circumstances" warranting disqualification, but instead are issues that may be explored at trial under the appropriate circumstances. *See, e.g., Dunlap v. People,* 173 P.3d 1054, 1075 (Colo.2007) (discussing defendant's use of alternate suspect evidence).

In sum, we find that the district court erred in finding that Watson's prior representation of Snyder was a "special circumstance" warranting disqualification of the DA's Office.

### C.

The district court cited a third ground for its disqualification order—namely, that the prosecutors applied an insufficiently detailed "shotgun approach" to the creation of the P–9 witness list. The court concluded that the P–9 witness list violated section 18–1.3–1201(3)(b), C.R.S. (2008), and Crim. P. 32.1(d)(2), which require the prosecutor, within twenty days of announcing intent to seek the death penalty, to provide the defendant with, among other things, a list of aggravating factors and a list of witnesses whom the prosecutor may call, specifying for each the witness' name, address, and date of birth, and the subject matter of the witness' testimony. The court also concluded that the P–9 witness list violated C.R.C.P. 11, which imposes a good faith requirement for all filings.

■ As stated above, in analyzing a motion for disqualification pursuant to section 20–1–107(2), the district court must determine whether "special circumstances" exist such that the defendant would be unlikely to receive a fair trial. This court has never found a discovery violation to be the type of special circumstance warranting disqualification. In fact, in *People v. District Court,* 808 P.2d 831, 836–37 (Colo.1991), we held that for a discovery violation the trial court should impose the least restrictive sanction that preserves the truth-finding process, restores a level playing field, and deters prosecutorial misconduct. *See also People v. Dist. Court,* 793 P.2d 163, 168 (Colo.1990) ("[T]he court should impose the least severe sanction that will ensure that there is full compliance with the court's discovery orders."). Disqualification of the entire DA's Office is a drastic remedy and certainly not the least restrictive sanction available for a discovery violation. *See, e.g., People v. Harlan,* 54 P.3d 871, 877 (Colo.2002) (describing disqualification as a "severe" remedy).

Furthermore, Perez has made no showing as to how the P–9 endorsements might interfere with his right to a fair trial and warrant disqualification of the DA's Office. Nor did the trial court make such a finding. Consequently, to the extent that the trial court relied on the P–9 witness list as a ground for disqualification of the DA's Office, we find that the allegedly inadequate witness list did not constitute "special circumstances" warranting disqualification.[20]

**20.** We do not consider the adequacy of the P–9 witness list itself or the propriety of the trial court's order striking a portion of the list, as those issues are not properly considered on interlocutory appeal.

### D.

The trial court's fourth ground for disqualification was its determination that the funding arrangement, whereby the DA's Office directly billed the DOC for the cost of prosecuting Perez and Bueno, violated section 16–18–101(3), C.R.S. (2008). We find that the funding arrangement was not a "special circumstance" warranting disqualification of the DA's Office.

Section 16–18–101(3) states, "The department of corrections, from annual appropriations made by the general assembly, shall reimburse the county or counties in a judicial district for the costs of prosecuting any crime alleged to have been committed by a person in the custody of the department." Here, under an arrangement arising out of tradition, the DA's Office directly billed the DOC for the cost of prosecuting Perez and Bueno with the understanding that the office would then forward that reimbursement to the counties. There is no evidence that the counties ever objected to this arrangement.

The trial court appears to have determined that the funding arrangement violated section 16–18–101(3), because the DA's Office billed the DOC directly, rather than submitting cost statements to the counties first and having the counties seek reimbursement from the DOC. We find that this sort of funding arrangement does not constitute a "special circumstance" warranting disqualification. Perez has made no showing as to how this arrangement interferes with his right to a fair trial, and the trial court made no such conclusion. On the contrary, the trial court explicitly stated that it was "unwilling to conclude that the district attorney was obtaining any intentional financial gain" or that there was any double-billing. In other words, the trial court found no violation of the second prong of section 20–1–107(2), which provides for disqualification "if the court finds that the district attorney has a personal or financial interest" in the case. Nevertheless, according to the trial court, "it remains that the statutory violations cannot be ignored in view of the fact that compliance

could have been easily accomplished." The question, however, is not whether compliance could have been easily accomplished, but rather whether non-compliance created a "special circumstance" rendering it unlikely Perez would receive a fair trial. We find that it did not, and that the trial court erred in determining that the financial arrangement warranted disqualification of the DA's Office.[21]

### IV.

Accordingly, we reverse the trial court's disqualification of the entire Eighteenth Judicial District Attorney's Office and remand for further proceedings consistent with this opinion.

Justice BENDER dissents, and Chief Justice MULLARKEY and Justice MARTINEZ join in the dissent.

Justice BENDER, dissenting.

### Introduction

In this death penalty prosecution, the majority reverses the trial court's disqualification of the Eighteenth Judicial District Attorney's Office. The majority misapplies precedent and fails to acknowledge the unique circumstances and key facts that led the trial judge to take the highly unusual step of disqualifying the entire office.

The majority states that it is applying the abuse of discretion standard to review the trial court's order but fails to adhere to the basic tenets of such a review. *Dunlap v. People*, 173 P.3d 1054, 1094 (Colo.2007). To reverse such an order and overcome the presumption the trial court exercised its discretion reasonably, we must find that the trial court's ruling was manifestly arbitrary, unreasonable, or unfair. *Id.* In addition, our review of this order must be colored by the due process requirements of the heightened reliability applicable when the state seeks the death penalty. Contrary to the majority's assertion in its footnote 14, the General Assembly does not have the authori-

---

21. We do not consider the propriety of the funding arrangement itself, as that is not properly considered on interlocutory appeal.

ty to decide when heightened reliability applies. This requirement is constitutional in nature, not statutory. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *People v. Tenneson,* 788 P.2d 786, 792 (Colo.1990).

With this standard of review in mind, I address the conflict of Dan Edwards, a prosecuting trial attorney, who in private practice represented Perez on a post-conviction proceeding arising out of an earlier homicide conviction. Edwards later switched sides to participate in the state's effort to convict and sentence Perez to death. The primary statutory aggravator for which the death penalty is being sought is the same felony conviction upon which Edwards represented Perez.

We have held that "where the prosecuting attorney had an attorney-client relationship with the defendant in a case that was substantially related to the case being prosecuted," special circumstances exist which require the disqualification of the entire district attorney's office under section 20–1–107(2), C.R.S. (2008). *People v. Chavez,* 139 P.3d 649, 653 (Colo.2006). Thus, I examine whether Edwards' prior representation of Perez is substantially related to the instant capital prosecution and conclude that it is.

Under Colo. RPC 1.9, matters are "substantially related" when there is a substantial risk that confidential information that would normally have been obtained in a prior representation would materially advance the adverse client's position in the new representation. The likelihood that Edwards, as part of the team directly prosecuting Perez, would have obtained confidential information about Perez which would aid the prosecution in seeking the death penalty against him is undeniable.

As his former post-conviction attorney for over six months, Edwards would have ordinarily received confidential information about Perez from a number of sources, including confidential presentence reports and discussions with his former lawyers. Edwards would have learned about the detailed circumstances of Perez's prior conviction as well as relevant background information, such as defense investigative reports, social and family histories, educational records and reports, employment records, institutional records, and psychological information. This confidential information would provide the prosecution with an unfair advantage when it presents aggravating evidence, seeks to rebut the defense's mitigation evidence, and urges the jury to sentence Edwards' former client to death. Unquestionably, Perez's homicide conviction is substantially related to the current capital prosecution of Perez.

If the cases are substantially related, then an irrebuttable presumption arises that material confidences have been reposed in the conflicted attorney. *See, e.g., Food Brokers, Inc. v. Great W. Sugar Co.,* 680 P.2d 857, 858 (Colo.App.1984); *Osborn v. Dist. Court,* 619 P.2d 41, 48 (Colo.1980).

Even if we assume arguendo that our law permits the district attorney to rebut this presumption, no evidence was introduced to establish that material confidences were not reposed in Edwards. In fact, when Edwards' file on Perez was subpoenaed in another matter, Edwards successfully asserted Perez's attorney-client privilege over the file, thereby admitting he had received material confidences relating to his prior representation of Perez.

Next, the impact of Edwards' individual conflict on the district attorney's office must be examined. Edwards worked on the *Perez* prosecution for over a month, billing approximately seventy hours on the case. In addition to performing substantial legal work on the case, Edwards reviewed the physical evidence and discussed it with fellow prosecutors. Our precedent requires that the entire office be disqualified when a conflicted prosecutor participates *directly* in the prosecution of his former client, which Edwards did. *Chavez,* 139 P.3d at 653; *People v. Manzanares,* 139 P.3d 655, 659 (Colo.2006). Even if we were to assume that despite Edwards' direct participation in *Perez,* evidence of adequate screening could serve to prevent disqualification of the entire office, the district attorney presented no such evidence. The district attorney's office had neither a conflicts check nor a screening policy. The only evidence of screening was Edwards' testimony that he shared no client confidences with

his colleagues at the district attorney's and Attorney General's offices. According to our precedent, such evidence is insufficient as a matter of law to protect the district attorney's office from disqualification. *Manzanares*, 139 P.3d at 659.

Adding to the special circumstances compelling disqualification of the office is the conflict of a second attorney, Robert Watson. For five months, Watson participated in the pre-charge investigation of the Heird murder, organized reports, and laid the groundwork for the current prosecutors. Watson previously represented a key prosecution witness who is also an alternate suspect in this homicide. In the course of this representation, Watson would normally have obtained confidential information which bears upon the sufficiency and reliability of the evidence against Perez, specifically the credibility of his former client's testimony. Like Edwards, Watson asserted the attorney-client privilege over the entirety of his 900–page file for this witness.

We have previously considered a prosecutor's conflict which arises from the prior representation of a client-turned-witness. *People v. Lincoln*, 161 P.3d 1274 (Colo.2007). In *Lincoln*, we held that the unrelated and attenuated nature of the prosecuting attorneys' prior representation of the defendant, as well as their constitutional obligation to disclose exculpatory evidence, mitigated any conflict that might arise as a result of the attorneys' post-charge prosecution of the defendant. *Id.* at 1276. However, because Watson's involvement was pre-charge, and the confidences were obtained before he began his investigation, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny did not require Watson to disclose his former client's confidences to his fellow investigators. Watson's inability to discuss confidential information relating to his former client with members of the investigating team created a conflict with his duty to ensure that guilt is decided upon sufficient evidence. This conflict hampered his, as well as his colleagues', ability to conduct a full and fair investigation of the Heird

murder. Because the investigation was tainted by Watson's prior representation of a witness and alternate suspect, the district attorney's decision to charge Perez was compromised.

Lastly, the trial court found that the district attorney's list of inmate witnesses whom prosecutors may call to support the death penalty was not filed in good faith. These eighty groundless endorsements needlessly diminished the defense's limited resources, diverted their efforts and energies, and forced them to chase illusory evidence. In my view, the large number of these endorsements adds to the unique set of circumstances supporting the reasonableness of the trial court's order of disqualification.

When the state seeks to extract the ultimate sanction against a citizen, it must act fairly to the accused. When it does, the state enhances the community's confidence in the judicial process. This concept, of course, embraces the notion that the prosecutor, who is a minister of justice for the community, must act in a fair and independent manner consistent with ethical rules and responsibilities.

The detailed factual findings of the trial court fully support its order disqualifying the entire office of the District Attorney for the Eighteenth Judicial District. I agree wholeheartedly with the principle that only in rare and exceptional circumstances should a government office be disqualified because of attorney conflicts of interest. When I view the facts of this case through the prism of our abuse of discretion standard, I am compelled to conclude that such a rare circumstance exists. The trial court's findings and rationale are not manifestly arbitrary, manifestly unreasonable, or manifestly unfair. Disqualification of the district attorney's office under these circumstances does not constitute an unreasonable exercise of discretion. The court's statement that "a web has been woven from which no fair trial can be obtained should the people continue to be represented by the present prosecutor's office ..." rings true.[1]

---

1. I agree with the majority's holding that the trial court erred in basing his disqualification

order in part on the mechanism by which the case was funded.

The majority faults the trial court by analyzing each factor relied upon by that court independently. This approach fails to account for the manner in which all three of the district attorney's office's ethical breaches combine to undermine the fairness of this death penalty prosecution. Reversal of the trial court's disqualification order denigrates the impartial administration of our system of justice. Although the law does not always proscribe moral wrongdoing, the district attorney, as a minister of justice, has a responsibility to act with the utmost care consistent with high ethical standards, particularly in a death penalty case. Hence, I respectfully dissent.

## Statement of Facts

My review of the record causes me to restate the most salient facts, some of which are contained in the majority opinion, to provide the reader with the evidentiary background that formed the basis of the trial court's detailed findings of fact.

Robert Watson, a deputy district attorney in the Eighteenth Judicial District, was at the crime scene within three hours of the Heird murder. For the next five months, Watson collected and reviewed evidence, and discussed it with both prosecution and Department of Corrections ("DOC") investigators. Watson reduced the results of his investigation to a detailed PowerPoint summary, which he presented to the DOC Investigator General and to members of the Eighteenth Judicial District Attorney's Office. During this five-month period, Watson failed to disclose that he had previously represented Michael Snyder, an inmate at Limon Correctional Facility ("LCF"), whom the DOC initially suspected in the Heird murder and who later became a central prosecution witness against Perez. Shortly after the discovery of Heird's body, a corrections' officer reported that the day before the murder, Snyder had made a recorded telephone call. In that call, Snyder told family members that he had been ordered to stab someone or else be killed. Snyder later told DOC investigators that the person he had been ordered to kill was Jeffery Heird.

Watson testified that he reviewed all the DOC reports. Nonetheless, he told the court that he took no action to search Snyder, to collect his clothing, or to search his cell. He never considered Snyder a suspect. When the defense in the current capital prosecution subpoenaed Watson's 900–page client file on Snyder, Watson successfully asserted his attorney-client privilege over the entirety of the file.

On December 5, 2005, the district attorney charged David Bueno, Alejandro Perez, and Michael Ramirez with first-degree murder and conspiracy. Almost a year later, the district attorney filed a notice to seek the death penalty against Perez. All three codefendants' cases were severed for trial, and Bueno's and Perez's cases were assigned to different district court judges.

The prosecution endorsed 203 witnesses for the sentencing phase, eighty of whom are inmate witnesses. With the exception of five of these inmates, the disclosures relating to the substance of their testimony are virtually identical. The deputy district attorney who prepared the inmate endorsements testified that he cut and pasted these endorsements for the entire B Pod and C Pod of LCF inmates. Included in the witness endorsements were Perez himself; at least one deceased inmate; and at least two inmates who, despite being endorsed as eye and ear witnesses, were not housed at LCF on the day of Heird's murder. In the course of pre-trial hearings, twenty-two of the twenty-six inmate witnesses testified and denied making statements consistent with those set forth in the endorsements. Some denied that they ever talked with law enforcement. Others told the court they were neither an eye nor an ear witness to Heird's killing, although they had been endorsed as such.

Six months after the filing of charges, Dan Edwards joined the Attorney General's Office as the second attorney in a two-lawyer unit, the Capital Crimes Unit, and was appointed as Special Deputy District Attorney in the Eighteenth Judicial District Attorney's Office. Edwards immediately went to work on the *Bueno* and *Perez* capital murder prosecutions. Edwards testified that these prosecutions were primarily his responsibility.

Edwards' time sheets indicate that in the first month he was assigned to the *Perez* and *Bueno* cases, he spent nearly every day working on the *Perez* prosecution, billing approximately seventy hours on this case. Edwards' work product included the research and preparation of a motion arguing that the standard of heightened reliability did not apply to the guilt phase of the prosecution. This pleading was signed by Edwards and filed in the *Perez* matter. Additionally, Edwards testified that he spent at least "a couple hours" viewing the physical evidence in the case and probably discussed the evidence with investigators Larry Frese, Paul Goodman, and Tom Powers, as well as with co-counsel. He further testified that he "work[ed] closely" with his supervisor in the Attorney General's Office, Sue Trout, as well as with Goodman, and Eighteenth Judicial District prosecutors Dan May and Richard Orman.

On June 4, 2007, the defense filed Perez Motion P–46, which sought, *inter alia,* the appointment of a special prosecutor based on the false endorsement of inmate witnesses and Edwards' conflict in prosecuting Perez for capital murder. The defense disclosed that Edwards had previously represented Perez on a post-conviction motion, which sought to invalidate Perez's second-degree murder conviction, the very conviction which the prosecution seeks to use as a statutory aggravator at Perez's death penalty trial. This was the first time that Edwards' conflict was brought to the attention of the court. Edwards represented Perez for a little more than six months, from August 27, 2002 to March 18, 2003.

Edwards testified that he had not met Perez in person during the course of the prior representation. However, his testimony indicated that he had other means of access to Perez's confidential information. Edwards was added to Perez's prison telephone list, although Edwards could not remember whether he spoke to Perez on the telephone. Edwards testified that it was his practice to review the district court record, including the confidential pre-sentence investigation reports, which include the defendant's full social, familial, and criminal histo-
ries, as well as any pertinent medical and psychological evaluations and test results. In response to a subpoena duces tecum issued in the *Bueno* case ordering him to produce his file on Perez, Edwards filed a motion to quash the subpoena, asserting successfully that the contents of the file were protected by the attorney-client privilege. At a hearing on the motion to quash, Edwards announced to the court that he was appearing "as a former criminal defense attorney for Mr. Perez."

After the defense revealed Edwards' prior representation of Perez in its P–46 motion, the trial court immediately issued a protective order screening Edwards from involvement in the *Perez* prosecution. Subsequently, the prosecution disclosed Edwards' prior representation of two of the endorsed inmate witnesses: Michael Snyder and Joseph Herrera. The defense then disclosed an additional witness, Derrick Martin, whom Edwards had also previously represented.

Edwards testified that he was still in contact with *Perez* prosecutors May and Orman after the protective order was issued. Edwards' time sheets in the *Bueno* case reveal that he met frequently with Sue Trout, who was also still working on the *Perez* case. As of the filing of this appeal, Sue Trout still had access to Edwards' files.

The District Attorney testified that her office has not adopted any written or unwritten conflicts check or screening policies.

After lengthy hearings and briefing, the trial court disqualified the district attorney's office and ordered the appointment of a special prosecutor pursuant to section 20–1–107(2). The trial court based its ruling on Edwards' conflict, Watson's conflict, the defective endorsement of witnesses, and an allegedly improper funding arrangement between the DOC and the District Attorney's Office.

## I. Edwards' Conflict

### Introduction

Under section 20–1–107(2), when a trial court "finds special circumstances that would render it unlikely that the defendant would receive a fair trial," disqualification of the

district attorney's office is required. We have held that "where the prosecuting attorney had an attorney-client relationship with the defendant that was substantially related to the case being prosecuted," such "special circumstances" exist. *Chavez*, 139 P.3d at 653. In a trilogy of cases, including *Chavez*, we employed the substantial relationship test in our section 20–1–107(2) analysis in order to determine the likelihood that an attorney has confidential client information from a prior representation that could be used to disadvantage the defendant and the impact of that attorney's conflict on the entire district attorney's office. *Chavez*, 139 P.3d at 653; *Manzanares*, 139 P.3d at 658–59; *Lincoln*, 161 P.3d at 1280–81. Importantly, these cases applied the substantial relationship test to determine, not simply whether an individual attorney's conflict required his personal disqualification, but whether that attorney's conflict constituted special circumstances rendering it unlikely that the defendant would receive a fair trial, and thus whether the entire district attorney's office had to be disqualified. *Chavez*, 139 P.3d at 653; *Manzanares*, 139 P.3d at 658–59; *Lincoln*, 161 P.3d at 1280–81. The individual attorney's possession of confidences may require disqualification of the entire office under two circumstances: (1) if the attorney were directly prosecuting his former client, or (2) if the confidential information could be passed from that attorney to others "actually prosecuting the case." *Chavez*, 139 P.3d at 653–54. Thus, the majority's statement in its footnote 17 that the substantial relationship test is irrelevant to our section 20–1–107(2) analysis contravenes our precedent.[2]

As our prior section 20–1–107 cases have explained, the substantial relationship test operates to guide our analysis of how significant the attorney's conflict is and how the conflict may infect or taint the conflicted lawyer's office, thus affecting the fairness of the defendant's trial under the statute. The test primarily protects client confidences, but it also preserves the duty of attorney loyalty to the former client. By its very nature, application of this test is fact and case specific. Of course, this is why the trial court makes this call and why we, as an appellate court, should only overturn this decision if it is manifestly arbitrary, unreasonable, or unfair.

**A. Edwards Possesses Client Confidences From His Prior Representation of Perez that Would Materially Advance the Prosecution's Position in This Case**

**1. Because Edwards' Prior Representation of Perez is Substantially Related to This Death Penalty Prosecution, Material Confidences Were Reposed in Edwards**

The principle in our case law construing section 20–1–107, that a prosecutor is barred from acting adversely to a former client in a matter substantially related to the prior representation, is drawn from the Colorado Rules of Professional Conduct. *Chavez*, 139 P.3d at 653 (citing Colo. RPC 1.11(c), C.R.S. (2006); *Osborn*, 619 P.2d at 47–48). Therefore, we look to the Rules of Professional Conduct to determine when matters are substantially related. *See Lincoln*, 161 P.3d at 1280 (applying Colo. RPC 1.9(a)'s substantial

---

2. The majority cites *Lincoln* for the proposition that the substantial relationship test applies only to individual conflicts. *Lincoln* applied section 20–1–107(2). 161 P.3d at 1279–81 (discussing whether prior representation of a witness constitutes "special circumstances" under section 20–1–107). Section 20–1–107(2) does not deal with the individual conflicts of deputy and assistant district attorneys; instead, as the majority acknowledges elsewhere in its opinion, it speaks *only* to disqualification of the district attorney's office. Maj. op. at 1228. Had the legislature wished to make section 20–1–107(2) applicable to individual deputy district attorneys, it certainly would have done so explicitly, as it did elsewhere in the statute. *Compare* § 20–1–107(2)

(referring only to the "district attorney") *with* § 20–1–107(4) (referring to "assistant district attorneys, or deputy district attorneys"). Thus, the majority misstates the import of *Lincoln's* application of the substantial relationship test. *Lincoln*, as well as *Chavez* and *Manzanares*, applied the test not to determine whether an individual attorney must be disqualified, but whether, as a result of an individual conflict, an entire district attorney's office should be disqualified. *Lincoln*, 161 P.3d at 1280–81; *Chavez*, 139 P.3d at 653; *Manzanares*, 139 P.3d at 658–59. Hence, under our precedent, the substantial relationship test must be applied to conflicts of the entire district attorney's office under section 20–1–107(2).

relationship test to determine whether prosecutors acquired material client confidences in the course of their former representations).

Comment three to Rule 1.9 explains that matters are "substantially related" if there is "a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Thus, the substantial relationship test focuses on "the risk—as opposed to the actual fact—of disclosure." *Annotated Model Rules of Professional Conduct* 164 (6th ed.2007); *see also Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir.1983) (collecting cases and concluding "'substantially related' ... means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actually obtained such information and used it against his former client....").

Because whether an attorney has actually received confidential information relating to the prior representation of a client is irrelevant to a determination of whether matters are substantially related, Rule 1.9 does not require the former client to allege that it disclosed confidential information to the attorney that could materially advance its adversary's position in order to prevail on a disqualification motion. Colo. RPC 1.9 cmt. 3; *see also Analytica*, 708 F.2d at 1267. Rather, the trial court's inquiry in deciding such a motion focuses on the nature of the prior representation and the kinds of information that would ordinarily have been revealed by the client in the prior representation. Colo. RPC 1.9 cmt. 3.[3]

The majority errs in focusing on whether Perez has proved that Edwards, in the course of representing him on his post-conviction motion, actually received confidential information, rather than on whether confidential information that would normally have been obtained in the course of such representation would materially advance the prosecution's position in seeking the death penalty against Perez.

An attorney who, like Edwards, represents a defendant on a post-conviction motion alleging that his trial attorney was constitutionally ineffective will interview witnesses, interview trial counsel, and uncover evidence, both harmful and helpful to his client, which was neither admitted in evidence at trial nor disclosed to the prosecution. As a result, much of what the post-conviction attorney learns will not be part of any public record. Defense counsel will also typically review confidential information contained in the trial attorney's client file or in the trial court file. That review will normally include confidential presentence investigation reports, which contain vast amounts of biographical information. Additionally, an attorney will interview the defendant himself and will very likely receive confidential information concerning the nature and circumstances of the crime.

The type of information that a post-conviction attorney investigating an ineffective assistance of counsel claim gathers would materially advance the prosecution's case that Perez should be put to death. Perez's motion for post-conviction relief stemmed from his second-degree murder conviction for the death of Raymond Nieto. The prosecution seeks to use this conviction as a statutory aggravator, which the trial court states is the "primary" aggravator, in support of a death verdict. While the fact of Perez's prior conviction for second-degree murder is a matter of public record, the prosecution, as established by its own witness endorsements, seeks to prove much more about Perez, his background, and his criminal acts, than the mere fact of his conviction.

The prosecution has endorsed at least thirty-four witnesses to testify about the facts and circumstances of the murder of Raymond Nieto. Of these witnesses, twenty law enforcement personnel were endorsed to testify regarding the facts of the murder and

---

**3.** *See also* Restatement (Third) of the Law Governing Lawyers § 132 cmt. d(iii) (2000) ("The substantial-relationship test avoids requiring disclosure of confidential information by focusing upon the general features of the matters involved and inferences as to the likelihood that confidences were imparted by the former client that could be used to adverse effect in the subsequent representation.").

"anything contained in [their] report[s]." The prosecution has endorsed an expert forensic pathologist to testify regarding, among other things, "the amount of pain that would be associated with the wounds suffered by [Nieto]. He may testify as to the length of time necessary to bleed to death from the ki[n]ds of wounds sustained by [Nieto]." Eleven family members, friends, or acquaintances of either Perez or Nieto, including Nieto's mother, have been endorsed to testify regarding, among other things, "the facts surrounding the crime, the nature of the crime, motivation for this crime, suffering of the victim, personality and history of the victim, ... the attitude of the defendant before, during, and after the commission of the offense, ... [and] any statements made by the defendant concerning the murder...."[4] The prosecution has endorsed the attorneys who prosecuted Perez for the Nieto murder to testify about "the attitude and statements of the defendant during the course of that matter."

The prosecution also has endorsed fifteen witnesses to testify about Perez's juvenile delinquency adjudications. Two other witnesses have been endorsed to testify about "the early criminal actions of the defendant." Finally, almost all of the 203 witnesses endorsed are expected to testify concerning Perez's alleged gang affiliation and its connection to Heird's murder.

Confidential client material uncovered in the ordinary course of post-conviction representation, such as the circumstances of the prior felony conviction and information related to the defendant's criminal history and gang affiliation, as well as any additional information contained in the presentence investigation report, could all be introduced during the eligibility phase of death penalty sentencing to establish either a statutory aggravator or to rebut defense mitigation evidence. *See People v. Dunlap,* 975 P.2d 723, 739 (Colo.1999). If the jury reaches the last phase of death penalty sentencing, the selec-

tion phase, then "all relevant evidence" may be introduced by the prosecution to assist the jury in determining whether to impose a sentence of death or life. *Id.* at 740–41. Additionally, confidential information regarding Perez's alleged gang affiliation could aid the prosecution in proving its theory of the Heird murder at the guilt phase of Perez's trial. Prosecutors possessing such information would have an advantage in preparing and examining witnesses, seeking potential additional witnesses, and cross-examining defense witnesses.

Because Edwards, in the ordinary course of his prior representation of Perez, would have obtained confidential information which would materially advance the prosecution's case in seeking the death penalty against his former client, his prior representation is substantially related to this death penalty prosecution. *See People v. Frisco,* 119 P.3d 1093, 1096 (Colo.2005).

### 2. The Prosecution Has Failed to Introduce Evidence Sufficient to Rebut the Presumption that Material Confidences Were Reposed in Edwards

Having established that Edwards' post-conviction representation of Perez is substantially related to the instant capital prosecution, I address the majority's conclusion that Edwards' testimony that he did not personally communicate with Perez establishes he received no confidential information from him. Maj op. at 1230–31.[5] This conclusion rests upon faulty premises.

First, our precedent, the great weight of cases in other jurisdictions, and scholarly thought, adhere to the principle that when an attorney's earlier representation of a client is substantially related to a subsequent representation adverse to that client, an irrebuttable presumption arises that the client's material confidences were reposed in the attorney. Second, even if we assume that a

---

4. *But see People v. Dunlap,* 975 P.2d 723, 745 (Colo.1999) (discussing admissibility of victim impact testimony for prior crimes).

5. Although the majority states that it does not rely solely on Edwards' testimony in concluding that he was neither in possession of nor shared client confidences, it points to no other evidence that would suggest these conclusions, except for its reference to the record generally. My review of the record indicates that no such evidence exists.

rebuttable presumption arises, as a few jurisdictions hold, then the prosecution in this case has failed to meet its factual burden to rebut this presumption. Under either theory, Perez's material confidences have been reposed in Edwards.

The majority of jurisdictions hold that once a former client demonstrates that matters are substantially related, an irrebuttable presumption arises that material confidences were reposed in the attorney. *See Annotated Model Rules of Professional Conduct* 180 (5th ed.2003) (collecting cases); Stephen Gillers, *Regulation of Lawyers* 279–81 (7th ed.2005); Restatement (Third) of the Law Governing Lawyers § 132 cmt. d(iii) (2000) ("When the prior matter involved litigation, it will be conclusively presumed that the lawyer obtained confidential information about the issues involved in litigation").[6]

Review of our cases indicates that Colorado follows this rule. *See, e.g., Food Brokers*, 680 P.2d at 858; *Osborn*, 619 P.2d at 48.

Because the presumption that material confidences were reposed in the former attorney is irrebuttable, a showing by the former client that the prior matter is substantially related to the present adverse representation, as I have shown with Edwards, ends the inquiry as concerns the particular attorney who had his hand in both matters. *See, e.g., Analytica*, 708 F.2d at 1266–67.

Assuming for the sake of argument that Colorado is one of the few jurisdictions allowing an attorney to rebut this presumption, the trial court's findings, supported by the record, reveal that the prosecution failed to do so.

My review of the record indicates that the majority misstates the import of Edwards' testimony by asserting that Edwards testified that he never received any information from Perez, "confidential or otherwise."

Maj. op. at 1226. Although Edwards testified that he never met Perez in person, this fact standing alone does not support the conclusion that he did not receive confidential information concerning his representation of Perez.

Confidential client information includes "not only ... matters communicated in confidence by the client but also ... all information relating to the representation, whatever its source." Colo. RPC 1.6 cmt. 3. This definition embraces any non-public information obtained by the attorney's agents during the representation even if it is never communicated to the attorney. *See* Restatement (Third) of the Law Governing Lawyers § 59 cmt. b.

Contrary to the majority's assertion, Edwards never claimed that, over the course of his six-month representation, he did not receive confidential information relating to his representation of Perez. Edwards was unable to remember whether he talked over the phone with Perez. Perez had added Edwards' office number to his telephone list and Edwards testified that it was his ordinary practice to contact the defendant once he had reviewed the trial transcripts. Edwards did not know whether his agents, including secretaries and paralegals, talked with Perez on the telephone; nor did he know whether these agents had placed communications from Perez or about Perez in the Perez file. Edwards testified that it was his ordinary practice in representing defendants on post-conviction motions to review the district court record and confidential presentence investigation reports, and could not deny that he had done so in this case. Edwards further testified that, when a client raised a claim of ineffective assistance of counsel, he would attempt to get some background information from lawyers familiar with the client's case and those who represented him at trial.

---

6. Legal scholarship likewise reflects the fact that this irrebuttable presumption is both well-established and sound.

> [A conflicted lawyer] can't say "but I can prove I don't know anything if you give me the chance." [The lawyer] doesn't get the chance. If the former client can show that the new (adverse) matter is substantially related to the former ... it is irrebuttably presumed that the lawyer gained confidential information in the prior matter relevant to the new one. (This is something of a tautology, isn't it? Because if the two matters are truly substantially *related*, then we would certainly expect a lawyer to have information *relevant* to the second matter ....).

Gillers, *supra*, at 281 (emphasis in original).

Again, Edwards did not remember whether he had done so in this case. The district attorney failed to advance any evidence to rebut the presumption that Edwards received confidences. In fact, assuming that in representing Perez Edwards followed the procedures he normally followed in post-conviction representation (procedures that any attorney of minimal competence would be expected to follow), it is highly likely that he did receive confidential information.

The most persuasive fact demonstrating that the prosecution did not rebut the presumption that Edwards received confidential information is Edwards' assertion of Perez's attorney-client privilege in his motion to quash a subpoena issued in the *Bueno* case ordering him to turn over Perez's post-conviction file. By raising the attorney-client privilege, Edwards himself asserted that he, in fact, did receive confidential information.

Here, the trial court, taking Edwards at his word and assuming that he had a good faith basis for filing the motion to quash, and thus a good faith basis to believe his file contained confidential client information, cited the filing of this motion as a major basis for its factual finding that Edwards possessed confidential client information. In effect, the majority, by overruling this factual finding, permits the prosecution to use Edwards' conflict as both a sword and a shield. Edwards was able to prevent Perez's codefendant from discovering his Perez file because he asserted the information is confidential and is therefore protected by the privilege. Then, as a prosecutor here, Edwards, according to the majority, asserted that he neither possessed nor received any confidential information, shielding the district attorney's office from disqualification.

## B. Edwards' Conflict Infected the District Attorney's Office

The rule that the conflict of one attorney in a firm or government agency is imputed to other members of that firm or government agency is "based on the presumption that those attorneys have access to confidential information about each other's clients." *People ex rel. Peters v. Dist. Ct.*, 951 P.2d 926, 930 (Colo.1998). We have held that "[t]he rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the state public defender." *Id.; see also People v. Castro*, 657 P.2d 932, 944 (Colo.1983) (The knowledge and official actions of deputy and assistant district attorneys "are imputable to the district attorney."). In jurisdictions, including Colorado, which follow the majority view "a prosecution office may be treated as the functional equivalent of a law firm for purposes of invoking the presumption of confidence sharing, but the office will usually be permitted to attempt to rebut that presumption." Richard E. Flamm, *Lawyer Disqualification: Conflicts of Interest and Other Bases* 649 (2003) (citing *Peters*, 951 P.2d at 930, to support the proposition that Colorado adheres to this majority rule).

Under this rule, proof that the district attorney's office has implemented a "timely and sufficient screen" will, in the ordinary case, warrant the denial of a motion to disqualify the entire office. Flamm, *supra*, at 649–50. "Conversely, where the personally prohibited prosecutor has not been effectively screened, disqualification of the prosecution office is likely to be ordered." *Id.* at 650. We have articulated a somewhat more stringent variation of this rule: "Certainly, a government prosecutor may be presumed to have some knowledge of the case prosecuted by his co-workers. However, in circumstances not involving vertical intra-agency relationships, we conclude that the presumption may be rebutted by contrary evidence." *Cleary v. Dist. Court*, 704 P.2d 866, 873 (Colo.1985).

Citing the foregoing language in *Cleary*, *Chavez* set forth the test for determining whether, under section 20–1–107, the presumption that a conflict of a member of the district attorney's office is imputed to the district attorney has been rebutted,[7] and thus

---

7. Although the majority correctly cites Colo. RPC 1.11 comment 2 for the proposition that the Rules do not impute the conflict of one government attorney to associated government attorneys or employees, comment 2 cautions that, even in a government office, "ordinarily it will be prudent to screen [conflicted] lawyers." Colorado's comment 2 was adopted in its entirety from

whether "special circumstances" requiring the disqualification of the entire office and the appointment of a special prosecutor exist. 139 P.3d at 654–55.[8] In *Chavez*, we stated that the adequacy of screening procedures is a crucial consideration in determining whether the individual prosecutor's conflict should be imputed to the entire office. *Id.* We held that the adequacy of the screening device is a question of fact to be decided by the judge and we indicated that a device can be effective only if the conflicted attorney is not directly or actually prosecuting the case.

> [T]he question of whether a district attorney's office has a screening policy that adequately obviates any special circumstances that might lead to an unfair trial is a *question of fact to be determined by the judge.* If the screening policy is adequate, then no disqualification is necessary because there are no special circumstances which would mandate disqualification. On the other hand, if no screening policy exists or the screening policy is for some reason inadequate, the court must determine whether confidential information from a prior representation nevertheless *has been* and can continue to be adequately screened from others *actually prosecuting the case,* in view of the nature of the

particular office and circumstances of the prior representation.

*Id.* (emphasis added).

Arguably, the question of whether an effective screen was set up to shield the flow of information need not even be decided in this case because Edwards, the conflicted attorney, was one of the attorneys actively prosecuting Perez. *Chavez* explains that the question of whether a screen was effective is relevant to whether the conflict of an attorney who is not taking an active role in prosecuting the case is imputed to those who are "actually prosecuting the case." *Id.* On the other hand, "where the *prosecuting attorney* had an attorney-client relationship with the defendant in a case that was substantially related to the case in which the defendant is being prosecuted," special circumstances exist "that would render it unlikely that the defendant would receive a fair trial" and disqualification of the entire district attorney's office is required by section 20–1–107. *Id.* at 653 (emphasis added); *see also Manzanares,* 139 P.3d at 659. Because the purpose of an effective screen is to prevent the flow of confidential information from the conflicted attorney to the prosecuting attorneys in order to prevent the information from being used adversely to the former client, then, where the conflicted attorney and the prose-

---

the Model Rules of Professional Conduct. The annotations to the Model Rules of Professional Conduct explain the Rules' preference for screening in such circumstances: " 'screening plainly is the only way a government lawyer can 'not participate' in a matter that is pending in her office.' " *Annotated Model Rules of Professional Conduct* 205 (5th ed.2003) (quoting Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 15.9, at 15–27 (3d ed.2000) and citing *United States v. Goot,* 894 F.2d 231 (7th Cir.1990)). Thus, although screening is not required to rebut the presumption of shared confidences under the Rules, it is critical evidence to establish that the tainted lawyer did not, and does not, participate in the handling of the matter. Although the rationale for screening provided by the comment and annotation is different from the rationale provided by *Chavez* and the great weight of authority in this country, the effect of comment 2 to Rule 1.11(d) is the same. This is particularly so in this case, where the conflicted lawyer substantially participated in prosecuting his former client. Hence, even if the majority's reliance on this rule were appropriate, Rule 1.11(d) would disqualify the entire office

because Edwards participated in the matter, rather than as a result of the presumption of shared confidences. In any event, unlike the "substantially related" test of Colo. RPC 1.9, we have never incorporated Colo. RPC 1.11(d)'s imputation principle into our section 20–1–107(2) analysis. Thus the comment cited by the majority is persuasive, but not controlling authority, as, by its terms, it suspends its application in the event that other law, in this case *Chavez,* controls.

8. Although there is some confusion in our case law regarding the application of section 20–1–107(2) to the conflict of a single attorney in the district attorney's office, see *Chavez,* 139 P.3d at 653, it should be noted that an individual attorney's conflict is analyzed under Colo. RPC 1.7 and 1.9, rather than section 20–1–107(2). Section 20–1–107(2) by its terms speaks only to the disqualification of the entire district attorney's office. Therefore, I analyze the effect of Edwards' conflict on the prosecution office as a whole under section 20–1–107, whereas, as noted above, Edwards' individual conflict would be analyzed under Colo. RPC 1.9.

cuting attorney are the same person, the adequacy of the screen is irrelevant to whether information has passed to the prosecuting attorney. In such a case, the information has passed to the prosecuting attorney by default, and special circumstances requiring disqualification exist.

As detailed in my statement of facts, Edwards' testimony, his time sheets, and the motions he drafted and filed in *Perez* prove conclusively that he "actually prosecut[ed]" Perez from May 1, 2007 until June 4, 2007, the date the trial court issued a protective order prohibiting Edwards from further involving himself in the matter. Thus, applying the rationale of *Chavez* that screening serves only to protect a district attorney's office from disqualification where the conflicted attorney is not actively involved in prosecuting his former client, section 20–1–107 requires disqualification of the entire office in this case.

Even assuming that my reading of *Chavez* is incorrect, and that *Chavez* requires the court to determine whether a conflicted attorney who is "actually prosecuting" his former client has been screened from the rest of the office, the district attorney failed to offer sufficient evidence of screening in this case.

*Chavez* requires that a court first inquire as to whether a formal, written screening policy exists. 139 P.3d at 654–55. If it does, then the presumption of shared confidences has been rebutted and the conflict is not imputed to the entire prosecution office. *Id.* If no policy exists or it is, for some reason, inadequate, then a court must determine whether the prosecution has introduced other evidence which shows that "confidential information from a prior representation nevertheless has been and can continue to be

adequately screened from others actually prosecuting the case." *Id.* Again, we review this factual determination for abuse of discretion. *Id.* In order to overturn it, we would have to determine that the trial court's findings are clearly erroneous or unsupported by the record. *Dunlap,* 173 P.3d at 1094.

The parties do not dispute that the district attorney's office had neither a conflict check nor a screening policy at the time Edwards was deputized. In *Manzanares,* we addressed the question of what evidence, absent a formal screening policy, is relevant to determine whether confidential information from a prior representation nevertheless has been and can continue to be adequately screened from others actually prosecuting the case. *Manzanares,* 139 P.3d at 659 (citing *Chavez,* 139 P.3d at 654). We held that "while a properly drafted screening policy provides evidence pertaining to whether confidential information was shared, *the assertions of members of the District Attorney's Office, without more, cannot justify the conclusion that no information was shared.*" *Manzanares,* 139 P.3d at 659 (emphasis added).[9] Similarly, my research has revealed no jurisdiction holding the assertions of a conflicted attorney that no confidences were shared as evidence sufficient to rebut the presumption of shared confidences.

If the assertions of members of the district attorney's office are insufficient, standing alone, to rebut the presumption of shared confidences, then, in the absence of any formal screening policy, we must look to other factors which would be useful in determining the likelihood that information has been adequately screened from others actually prosecuting the case.[10] These factors include the size and structure of the prosecution office,

---

**9.** Notably in *Manzanares,* unlike the present case, the prosecution actually did offer evidence of a screening policy. 139 P.3d at 657–58. However, because the policy did not clearly apply to McMillan as a clerical employee, the assertions of members of the district attorney's office that McMillan had nevertheless followed the policy were not enough to rebut the presumption that confidences were shared. *Id.* at 659.

**10.** In many jurisdictions, however, the absence of a screening policy is fatal to the district attorney's ability to rebut the presumption of shared

confidences. *See, e.g., People v. Choi,* 80 Cal. App.4th 476, 94 Cal.Rptr.2d 922, 927–28 (2000) (record belied claim that an ethical wall had been erected between the district attorney and prosecuting attorneys and thus "it was unlikely that the defendants would obtain a fair trial"); *People v. Doyle,* 159 Mich.App. 632, 406 N.W.2d 893 (1987) (affirming the disqualification of the entire prosecutor's office where a supervisory lawyer with a personal interest in the case was not immediately shielded from any involvement in it).

*Andric v. California,* 55 F.Supp.2d 1056, 1066–69 (C.D.Cal.1999) (despite the erection of screen from the outset of the conflict, a government office was disqualified, in part, on the basis that the small size of the office (thirty attorneys) made sharing of confidences likely); the notoriety of the case, *Id.* at 1066; and whether the conflicted attorney has assisted in the prosecution in any capacity, *United States v. Goot,* 894 F.2d 231, 236 (7th Cir.1990). *See also English Feedlot, Inc. v. Norden Labs. Inc.,* 833 F.Supp. 1498, 1507 (D.Colo.1993) (applying Colorado law and endorsing these factors). To these factors, I would add as relevant whether any informal screening mechanisms were employed, despite the absence of a formal, written policy.

The prosecution introduced no evidence that, under *Chavez* and *Manzanares,* would be sufficient to rebut the presumption of shared confidences as concerns Edwards. The fact that no conflicts check was performed, that there was no screening policy in place, and that Edwards was substantially involved in prosecuting Perez from May 1, 2007 until June 4, 2007 militates strongly against a finding that the presumption was rebutted. Thus, by June 4th, the damage had already been done and the entire office was tainted by Edwards' involvement. Any screening that may have occurred after that time is irrelevant to whether the presumption that confidences were shared during that period has been rebutted.[11] Indeed, not even informal screening could have occurred during that period since, because Edwards, Chambers, and Trout all failed to perform even rudimentary conflict screening, they were unaware that a conflict existed. The only evidence of screening during this period offered by the district attorney is Edwards' assertion that he shared no confidences with his colleagues. Under *Manzanares,* this assertion, without more, is insufficient as a matter of law to rebut the presumption of shared confidences. The trial court's protective order, which the majority interprets as a de facto screen, could not repair the damage Edwards' involvement had already done.

Moreover, the prosecution's conduct even after the trial court issued its protective order establishes that this order did not sufficiently shield Edwards from contact with the attorneys prosecuting the case. Although the prosecution did not introduce evidence of the size of the district attorney's office (at least not of Dan May's office), the record reveals that the Capital Crimes Unit of the Attorney General's Office consists of only two attorneys: Dan Edwards and his superior, Sue Trout.[12] The record further reveals that, not only did Sue Trout continue to work on *Perez* after the trial court issued the protective order, she continued to meet frequently with Edwards and had access to all of his files on this prosecution. Edwards testified that he was still in contact with *Perez* prosecutors May and Orman, even after the protective order was issued. Thus, none of the factors which would support the existence of informal screening are present.

In sum, the majority's analysis of Edwards' conflict and how it impacts the entire office disregards our precedent. It paints an unrealistic picture of the actual conflict that Edwards faced in both representing Perez and then seeking to convict and sentence him to death, and the manner in which this conflict tainted the entire office. It ignores the fact that neither Edwards nor the district attorney's office advised the court of his conflict. And it fails to provide any rationale demonstrating that the trial court's ruling was manifestly arbitrary, manifestly unreasonable, or manifestly unfair.

**11.** *See, e.g., Papanicolaou v. Chase Manhattan Bank,* 720 F.Supp. 1080, 1087 (S.D.N.Y.1989) ("[T]his Court doubts whether any [ethical] walls, which are meant to be preemptive, can ever function effectively when erected in response to a motion, and not prior to the arising of the conflict."); *see also Asyst Techs., Inc. v. Empak, Inc.,* 962 F.Supp. 1241, 1243 (N.D.Cal. 1997) ("[W]hatever the efficacy and legal import of an ethical screen … nothing was in place here until after this motion was filed.").

**12.** While the Attorney General's Office did have a screening policy in place at the time Edwards was assigned to *Perez,* Edwards testified that he did not believe it applied to him. The policy required attorneys to check for conflicts when a case is assigned to them. Neither Edwards nor Trout, as his supervisor, followed the policy.

## II. Watson's Conflict

I now turn to the question of whether the trial court abused its discretion in taking into account former prosecutor Robert Watson's prior representation of principal witness and alternate suspect Michael Snyder in ordering disqualification of the district attorney's office. In my view, the trial court reasonably and appropriately took into account Watson's conflict to support its decision. I summarize my reasoning: The facts of the case in which Watson previously represented this witness are substantially related to the homicide in this case. In the course of his prior representation, Watson would normally have obtained confidential information about his client which bears on the sufficiency and reliability of the evidence against Perez in the Heird murder. Although Watson was deeply involved in investigating the Heird murder, he was prohibited from sharing this information with his investigative colleagues. Watson's conflict therefore hindered the investigation and, consequently, tainted the district attorney's decision to charge Perez.

We previously addressed the potential conflict that arises because of a prosecutor's prior representation of a client-turned-witness in *Lincoln*, 161 P.3d 1274. In such circumstances, a conflict may arise because of the prosecutor's competing duties with regard to disclosure of exculpatory evidence to the defense. *Id.* at 1276. On the one hand, the prosecutor is obligated to maintain the confidences acquired in the course of representing the client-turned-witness. *Id.* On the other hand, the prosecutor is constitutionally obligated to disclose all exculpatory material to the defense under *Brady*, 373 U.S. 83, 83 S.Ct. 1194, and its progeny. *Lincoln*, 161 P.3d at 1280. In *Lincoln*, we held that this conflict may be mitigated by both the attenuated nature of the prior representation and the constitutional obligation of the prosecution to disclose exculpatory material, which would trump the prosecutor's ethical and statutory obligations to maintain client confidentiality. *Id.* at 1276. Ordinarily, a prosecutor who faces a potential conflict stemming from his prior representation of a witness may avoid disqualification of the entire prosecution office under section 20–1–107, and even personal disqualification, by following the procedures developed in *Lincoln. Id.* at 1281. However, *Lincoln* did not hold that a prosecutor's prior representation of a witness can never result in a conflict. *Lincoln* held that where it is unlikely that the prosecutor possesses exculpatory material because the former representation is not substantially related to the present prosecution and where *Brady* functions as an added security measure ensuring disclosure of any exculpatory material, disqualification is not necessarily required. 161 P.3d at 1276, 1280.

Unlike *Lincoln*, Watson's conflict as an investigating attorney arises from the tension between his duty to maintain his former client's confidences and his duty to ensure that "guilt is decided upon sufficient evidence,"[13] rather than his duty to disclose exculpatory material to the defendant under *Brady*.

When a prosecutor investigates and develops the prosecution's theory of a case before charge, the prosecutor faces a conflict if a witness is a former client and the prosecutor's former representation of that witness is substantially related to his investigation. In such a case, not only is there a danger that the investigating attorney's prior representation may color his personal view of the evidence, but, even if he vigilantly guards his judgment so as to remain completely impartial, his inability to communicate candidly with fellow investigators regarding the sufficiency of the prosecution's evidence compromises the accuracy and completeness of the prosecution's investigation. In this way, a prosecutor's duty to maintain his former client's confidences hampers his duty to conduct a full and fair investigation.

For example, a prosecutor charged with investigating a particular witness may know, as a consequence of prior representation,

---

**13.** Colo. RPC 3.8 cmt. 1; *see also* ABA Standards for Criminal Justice, Prosecution Function 3–3.11, at 83 (3d ed. 1993) ("A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case, independent of whether disclosure to the defense may be required. The duty of a prosecutor is to acquire all relevant evidence without regard to its impact on the success of the prosecution.").

that the witness is a drug user or has some motive to lie, but is unable to discuss his concerns with other investigators. The conflicted prosecutor's colleagues, who are investigating other aspects of the case, may take his silence as an affirmation of the witness' credibility or, more likely, may simply fail to follow up, assuming that the conflicted attorney is handling the matter and addressing any potential problems. In such a situation, because of the conflicted prosecutor's involvement in the case, other members of the prosecution team may never discover a problem in their theory of the case they would otherwise have uncovered. A prosecutor whose view of the evidence is tainted by a prior confidential relationship, and who is unable to communicate freely regarding the reliability and trustworthiness of the prosecution's evidence, including witness testimony, is incapable of carrying out his obligation to seek justice in the performance of his investigation.

Unlike *Lincoln*, this is not a conflict that *Brady* can mitigate. *Brady* addressed the prosecution's obligation to disclose exculpatory evidence to a defendant. 373 U.S. at 87, 83 S.Ct. 1194; *see also United States v. Agurs*, 427 U.S. 97, 103, 106–07, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). For *Brady* to come into play, there must at least be a defendant to whom information will be disclosed. *See In re Attorney C*, 47 P.3d 1167, 1168 (Colo.2002) (obligation to disclose exculpatory material triggered before each critical stage of the proceeding). Before charges are filed, there is no defendant and thus, no one to whom information must be disclosed. Because Watson left the district attorney's office before charges were filed against Perez, *Brady's* disclosure obligations do not resolve his conflict.

One caveat needs to be mentioned. Our precedent extends the *Brady* obligation to require that a pre-charge prosecutor preserve exculpatory evidence obtained during the investigation for disclosure to a future

defendant. *People v. Sheppard*, 701 P.2d 49, 52 (Colo.1985). However, exculpatory evidence learned by the prosecutor as a result of an earlier client relationship would not be evidence obtained during his investigation as a prosecutor. As a result, this confidential information could not be shared with investigatory colleagues.

Therefore, our analysis in *Lincoln*, which relied on the force of a prosecutor's *Brady* obligations to mitigate any conflict arising from prior representation of witnesses, will not apply to cases like Watson's, where exculpatory information valuable to the accused's defense will remain shielded from others involved in building a case against the defendant, thus tainting the defendant's right to a fair trial.[14]

Having determined that Watson's conflict cannot be mitigated by the prosecution's *Brady* obligations, and thus that *Lincoln* is inapplicable to the present case, I turn to examine whether the circumstances of Watson's prior representation of Snyder make it likely that Watson received confidential client information which would compromise his ability to investigate fully and fairly the Heird murder and communicate candidly with other investigators on the case. Under the analysis discussed concerning Edwards, the answer to this question depends on whether there is a "substantial relationship" between Watson's representation and the prosecution of Perez. *Lincoln*, 161 P.3d at 1281 (considering the factual overlap between cases to determine whether a conflict arising out of prior representations of witnesses exists); *Frisco*, 119 P.3d at 1096 (applying the substantial relationship test to a witness conflict). Again, the substantial relationship test must be applied here because it serves to measure the danger that confidential information gained in the course of a prior representation will disadvantage the defendant in the present case by testing the factual overlap between the cases.[15]

14. *See also* ABA Standards for Criminal Justice, Prosecution Function 3–3.11, at 82 (The responsibility to "see that ... guilt is decided upon the basis of sufficient evidence, including the consideration of exculpatory evidence known to the prosecution ... goes beyond the corollary duty imposed upon prosecutors by constitutional law.").

15. With respect to Edwards' prior representation of Perez, the defendant is disadvantaged because such confidences could be used to materially

Watson previously represented Michael Snyder on a post-conviction motion challenging his conviction for the murder of Mark Henderson. Watson testified that Henderson, like Heird, had been an inmate who was labeled a snitch. Watson testified that Henderson's killing, like Heird's, was believed to have been gang related. Watson acknowledged that the prosecution believed that the Henderson murder was connected to the Aryan Brotherhood, a prison gang, and although Watson could not recall at the time of his testimony, there was evidence that Heird had also been connected to that gang. Henderson, like Heird, had been stabbed to death close to dinner time. Both cases involved two assailants and a lookout. In both cases, Watson recalled, similar steps were taken to dispose of the evidence. Watson also acknowledged that either Snyder's trial attorney's case file or the discovery he received in the course of representing Snyder mentioned the killing of another inmate, Daniel Shettler. The prosecution's theory of Shettler's murder was that Snyder, as vice president of the Aryan Brotherhood, had ordered it in retaliation for Shettler's acting as an informant in Henderson's murder. *See Blecha v. People,* 962 P.2d 931, 935 (Colo. 1998) (discussing facts of Shettler murder). Similar to the circumstances of both Henderson's and Heird's murders, Shettler's murder also involved three participants and was connected to the Aryan Brotherhood.

Although Watson testified that he did not consider Snyder an alternate suspect in the Heird murder, he admitted that he "received materials from the Department of Corrections as they conducted their investigation" of Heird's death. The DOC investigation revealed that, within three hours of the discovery of Heird's body, a corrections officer reported a phone call made by Snyder the day before the homicide. Snyder told family members that he had been ordered to murder an inmate and that, if he failed to comply, he would be murdered himself.

Snyder later told investigators that the individual he was instructed to stab was Jeffrey Heird. When asked by investigators about his phone call the day before the murder, Snyder offered conflicting stories. First, he claimed that he shouted the word "kill" into the phone just to see if the prisoner staff was listening to his conversation. He later changed this story, claiming that the DOC had spliced the word "kill" into the recording of the conversation in an attempt to frame him. When asked if an investigation would reveal the presence of his DNA in Heird's cell, Snyder stated that it probably would. He also acknowledged that he had blood on his clothing following Heird's murder.

Thus, the facts of this case demonstrate that Watson's previous representation of Snyder is substantially related to the present prosecution in that the close connection between the prior representation and the present case makes it likely that Watson received information from his prior representation that may have implicated Snyder or, at the very least, cast doubt on the strength of his value as a witness against Perez.

The facts uncovered by both the DOC and defense investigations strongly suggest that Snyder's involvement should have been scrutinized. However, as the trial court noted, "for reasons unknown, Snyder was not investigated, his cell was never tossed and he was never considered a suspect in the case." Hence I conclude that the trial court did not abuse its discretion in concluding that Watson's prior representation of Snyder tainted his ability to conduct a full and fair investigation and that his inability to communicate candidly with his fellow prosecutors impacted this investigation as a whole.

Moreover, even if it were possible to rebut the presumption that confidences were reposed in Watson which tainted his ability to fairly conduct the investigation of the Heird murder,[16] nothing in the record suggests that

---

advance the prosecution's position in the present case. With respect to Watson's representation of Snyder, the defendant is disadvantaged because such confidences could have tainted the prosecution's investigation.

**16.** As noted in my discussion of the conflict arising from Edwards' representation of Perez, once matters are shown to be substantially related, a presumption arises that confidences relevant to both cases were reposed in the conflicted attorney. For the purposes of this discussion, I will

the prosecution has succeeded in doing so. Contrary to the majority's assertion that "there · was no showing that Watson possessed confidential information from his prior representation of Snyder that could be passed to members of the [district attorney's office]," maj. op. at 1232, ample evidence in the record supports the opposing conclusion. Watson's file on Snyder consisted of 900 pages. Watson asserted the attorney-client privilege over the entirety of his Snyder file when defense attorneys subpoenaed it. He testified that a substantial portion of Snyder's file was received from his trial counsel. Watson testified that he met in person with Snyder twice, each time for "three or four hours." He reviewed reports compiled by defense investigators and he advised Snyder concerning his post-conviction motion.

The majority states that the question is whether the confidential client information "could be passed to members of the [district attorney's office] who continue to prosecute the case." Maj. op. at 1232. I disagree. In my view, the danger that Watson's conflict poses is that the confidential client information tainted the district attorney's investigation precisely because it could *not* be passed. Watson's substantial involvement in the Heird investigation, as detailed in my statement of facts, makes the threat of taint likely.

The majority acknowledges the possibility that Watson's duty to maintain the confidences of a chief prosecution witness and potential alternate suspect could have compromised the completeness of the investigation. Maj. op. at 1233. However, the majority holds, based on the premise that Watson's conflict does not implicate the fairness of the trial itself, that Perez's only recourse is to explore the inadequacy of the investigation "at trial under the appropriate circumstances." *Id.* This conclusion is problematic.

· Our precedent states that a conflict may affect the fairness of a trial, within the meaning of section 20–1–107, without directly impacting the procedural safeguards of the tri-

al. *People ex rel. N.R.*, 139 P.3d 671, 677–78 (Colo.2006) (likelihood that political indebtedness would cause a district attorney to "over extend" himself in deciding to file charges against defendant is relevant to the determination of whether "special circumstances" exist). In *N.R.*, we were concerned, not with the effect of a prosecutor's conflict on the quality of discovery or its effect in creating a potential advantage in cross-examining witnesses, but rather with the fairness and impartiality of the district attorney's exercise of her discretion to prosecute. *Id.* Similarly, in Perez's case, where the decision to prosecute is tainted by an incomplete investigation stemming from an attorney conflict of interest, the fairness of the trial is implicated. Additionally, because exculpatory information that should make it into the hands of other prosecutors never does, the defendant's access to discovery is compromised, and his ability to plea bargain and fashion a defense is undermined.

Watson's duty to maintain client confidences received in the course of his prior representation of Snyder compromised his ability to communicate with other prosecutors concerning Snyder's viability as an alternate suspect or, at the very least, Snyder's reliability as a key witness. Because Watson, by providing the prosecution team with reports and theories of culpability, was deeply involved in investigating the Heird murder, the prosecution's investigation as a whole has been affected, thus tainting the district attorney's decision to prosecute Perez. Where the district attorney's decision to prosecute has been affected by a conflict of interest, "special circumstances" making it "unlikely that the defendant will receive a fair trial" exist. *N.R.*, 139 P.3d at 677–78; *Wheeler v. Dist. Court*, 180 Colo. 275, 504 P.2d 1094, 1095–96 (1973). Thus, I conclude that the trial court did not abuse its discretion in taking Watson's conflict into account when it disqualified the district attorney's office.

### III. Bad Faith Witness Endorsements

The majority holds that the trial court, when it disqualified the district attorney's

---

assume that the presumption is rebuttable. However, as previously mentioned, this is probably not the case. Precedent from Colorado and

the vast majority of other jurisdictions provides for an irrebuttable presumption. *See, e.g., Food Brokers*, 680 P.2d at 858; *Osborn*, 619 P.2d at 48.

office, abused its discretion in taking into account the prosecution's witness endorsements for the penalty phase of the capital trial. Maj. op. at 1233. The trial court found that the prosecution endorsed eighty inmate witnesses without any basis in fact for believing that these witnesses would testify consistently with the description of their testimony provided by the prosecutors. The trial court found that the listing of these witnesses was "not in good faith," and that the endorsement was compiled as a "shotgun effort" by the prosecution. Although I would not find that this conduct is sufficient by itself to disqualify the district attorney's office, it is nonetheless a relevant factor supporting the reasonableness of the court's disqualification order.

Section 18–1.3–1201(3)(b)(II), C.R.S. (2008), and Crim. P. 32.1(d)(2) together set forth the special obligation of a prosecutor in a death penalty sentencing hearing to furnish a list of witnesses the prosecutor "may call" at the hearing within twenty days of the prosecutor's filing of a statement of intention to seek the death penalty. Under the statute and the rule, the prosecutor "shall furnish," along with the names of each witness, "the witness' address and date of birth, the subject matter of the witness' testimony, and any written or recorded statement of that witness, including notes." Crim. P. 32.1(d)(2); see also § 18–1.3–1201(3)(b)(II). This obligation is separate and distinct from a prosecutor's ordinary discovery obligations under Crim. P. 16(a).

It is undisputed that a prosecutor who makes any representation to the court or to opposing counsel must do so in good faith. This fundamental requirement derives from the prosecutor's role as both a minister of justice and an officer of the court. Hence, in the context of a prosecutor's disclosure obligations under section 18–1.3–1201 and Crim. P. 32.1, a prosecutor must disclose witnesses whom she in good faith, with some factual basis for her representation, believes she may call at the penalty phase of the defendant's capital trial. Similarly, the prosecutor "shall" disclose, among other things, "the subject matter of the witness' testimony" in good faith with some factual basis for believ-

ing that the witness will testify as described. Crim. P. 32.1(d)(2); § 18–1.3–1201(3)(b)(II), C.R.S.

In this case, the prosecution endorsed eighty inmate witnesses to testify at Perez's sentencing. The first inmate witness listed by the prosecution in its witness endorsement is Perez himself. Obviously, the prosecution had no good faith basis for representing to both the court and to the defense that the defendant would testify on the People's behalf. In addition, the prosecution endorsed at least one inmate witness who was deceased.

As the trial court noted, with the possible exception of five of the endorsed inmate witnesses, the disclosures relating to the substance of the witnesses' expected testimony is virtually identical for all inmate witnesses. The deputy district attorney responsible for assembling the inmate component of the Crim. P. 32.1 endorsement list acknowledged that he had cut and pasted these boilerplate disclosures for each witness. The trial court concluded, "while the People have set forth the information that an eye or ear witness may possess, the evidence indicates that in no instance were the People specific with respect to the subject matter to be testified to by any particular inmate." As noted by the trial court, twenty-two of the twenty-six endorsed inmate witnesses who testified in the pre-trial proceedings denied that they ever made statements consistent with the description of their expected testimony set forth in the endorsements. In some instances witnesses denied that they ever talked to an investigator or, despite being endorsed as eye or ear witnesses, denied that they were anywhere near the scene of the murder. The trial court also received as evidence letters from endorsed inmate witnesses stating clearly that they were neither percipient witnesses nor willing to testify in the Perez matter.

The testimony of those twenty-two endorsed inmate witnesses was corroborated by the testimony of both the deputy district attorney who prepared the inmate endorsements and the testimony of prosecution investigator Frese. They testified that with respect to all but four of the inmate wit-

nesses, there existed nothing in the discovery, including investigative reports generated by Frese, that supported the representation that the witnesses endorsed would testify in the manner described by the prosecution's endorsements.[17] In its briefing before this court, the prosecution acknowledges that that its representations concerning the subject matter of the inmate witness testimony were not "based on statements [the witnesses] had made during the investigation." Finally, the trial court noted that, contrary to the requirements of the statute and the rule, in numerous instances the addresses of witnesses were not provided nor were witness names listed with specificity until the People were ordered to do so.

Under section 18–1.3–1201(3)(h), a broad range of sanctions for noncompliance with the endorsement provisions can be imposed at the court's discretion. Notably, the court may enter any order that it "deems just under the circumstances." *Id.* Crim. P. 32.1(d)(8), relating to sanctions for violation of, *inter alia*, the witness list requirement, contains identical language.

The majority cites two of our cases for the proposition that a "trial court should impose the least restrictive sanction" for discovery violations. Maj. op at 1233 (citing *People v. Dist. Court, City & County of Denver*, 808 P.2d 831 (Colo.1991), and *People v. Dist. Court, Seventeenth Judicial Dist.*, 793 P.2d 163 (Colo.1990)). However, these cases are inapposite. Both cases dealt with violations of pre-trial discovery under Crim. P. 16, not violations of Crim. P. 32.1 and section 18–1.3–1201, which are special rules applicable only to the penalty phase of a capital case. The requirements of these rules are different, the purposes of these rules are different, and the sanctions imposed by each for violation should be different. Different standards apply when the People seek the death penalty.

The majority states that Perez "made no showing as to how" the defective Crim. P.

32.1 witness endorsements "might interfere with his right to a fair trial." Maj. op. at 1233. I disagree.

Perez's capable attorneys argued that, as a result of the endorsements made "not in good faith," the defense expended unnecessary time and effort investigating these eighty witnesses. The defense team was distracted from preparation of legitimate defense issues in this capital case. Such a needless diversion of the defense's resources compromised the fairness of Perez's trial. Consideration of this inappropriate prosecution conduct by the trial court as support for its order disqualifying the district attorney's office under section 20–1–107 was not manifestly arbitrary, manifestly unreasonable, or manifestly unfair.

### Conclusion

In addition to the above, the trial court also noted Edwards' previous representation of three prosecution witnesses while in private practice: Michael Snyder, Derrick Martin, and Joseph Herrera. The trial court, considering the combined effect of Edwards' conflict, Watson's conflict, the prosecution's lack of a conflict check and screening policy, and the failure of the prosecution to endorse penalty phase witnesses in good faith, concluded that "a web has been woven from which no fair trial can be obtained should the people continue to be represented by the present prosecutor's office . . . ."

In my view we should be affirming, not rejecting, the trial court's findings and conclusion.

I am authorized to state that Chief Justice MULLARKEY and Justice MARTINEZ join in the dissent.

---

**17.** In the trial court and in its briefing before this court, the prosecution argued that their lawyers had a good faith basis to believe that many of the endorsed inmate witnesses had personal knowledge of some of the facts represented in the endorsement. This argument misses the point. The statute and rule call for a description of the witnesses' expected testimony, not what the witnesses might know. Thus, at a minimum, the prosecution was required to interview the witnesses it endorsed before concluding how a witness will testify. As the trial court found, these witnesses at no point gave any sign to investigative law enforcement personnel that they would testify in the manner described.